## UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

| | |
|---|---|
| LAUREL HILBERT, ) | |
| ) | **Case No. 1:23-cv-1572** |
| 2039 New Hampshire Avenue, N.W. ) | |
| Washington, D.C. 20009 ) | |
| ) | |
| *Plaintiff,* ) | |
| ) | |
| v. ) | |
| ) | |
| PHILZ COFFEE, INC., a Delaware ) | **Jury Trial Demand** |
| Corporation d/b/a Philz Coffee and ) | |
| www.philzcoffee.com ) | |
| 1258 Minnesota Street ) | |
| San Francisco, California 94107 ) | |
| SERVE: ) | |
| Registered Agent: CSC Lawyers Incorporating ) | |
| Service ) | |
| 2710 Gateway Oaks Drive, Suite 150N ) | |
| Sacramento, CA 95833 ) | |
| ) | |
| *Defendant.* ) | |
| ) | |

## <u>VERIFIED COMPLAINT</u>

### <u>INTRODUCTION</u>

1.  Plaintiff, Mr. Laurel Hilbert asserts the following claims against Defendant Philz Coffee,

    Inc. ("Defendant") as follows:

2.  The Supreme Court of the United States has stated "[t]he Internet's prevalence and power

    have changed the dynamics of the national economy." *South Dakota v. Wayfair, Inc.*, 138

    S. Ct. 2080, 2097 (2018) (the Court noted that in 1992, less than two (2) percent of

    Americans had Internet access whereas by 2018 the number increased to roughly eighty-

nine (89) percent).  This number has steadily increased as polling data from 2021 shows ninety-three (93) percent of American adults use the Internet.[1]

3.      Based on a 2018 report, over forty (40) million people in the United States were documented with a disability, including over seven and a half (7.5) million individuals who have a visual disability.[2]  According to the National Federation of the Blind's 2016 report (updated in 2019), approximately 418,500 visually impaired persons lived in the State of New York.[3]

4.      Plaintiff brings this civil rights action against Defendant for its failure to design, construct, maintain, update and operate its website and/or mobile application platforms (hereinafter "Websites") to be fully accessible to and independently usable by Plaintiff and other blind or visually impaired people.

5.      Plaintiff uses the terms "blind" or "visually impaired" interchangeably to refer to all people with visual impairments who meet the legal definition of blindness in that they have a visual acuity with correction of less than or equal to 20 x 200.

6.      Defendant's denial of full and equal access to its Websites and therefore denial of its goods and services offered thereby is a violation of Plaintiff's rights under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C § 12182(a), the D.C. Human Rights

---

[1]     Internet/Broadband Fact Sheet, PEW RESEARCH CENTER (April 7, 2021) https://www.pewresearch.org/internet/fact-sheet/internet-broadband/ (last visited November 23, 2022).  Indeed, the polls also show ninety-nine (99) percent of American adults between the ages of eighteen (18) to twenty-nine (29) use the Internet, and ninety-eight (98) percent of American adults between the ages of thirty (30) to forty-nine (49) use the Internet.

[2]     Lee W. Erickson & S. von Schrader, *2018 Disability Status Report: United States*, CORNELL UNIVERSITY 10 (2020), https://www.disabilitystatistics.org/StatusReports/2018-PDF/2018-StatusReport_US.pdf (last visited November 23, 2022).  The report uses data from the 2018 American Community Survey.

[3]     Blindness Statistics, National Federation of the Blind (updated January 2019) https://nfb.org/resources/blindness-statistics (last visited May 31, 2023).

Act ("DCHRA"), D.C. Code § 2-1401 *et seq*. and the Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq.*, ("Unruh Act").

7.     Because Defendant's Websites are not equally accessible to blind and visually impaired consumers, they violate the ADA, the DCHRA and the Unruh Act.  Plaintiff seeks a permanent injunction, actual and liquidated damages, and reasonable attorneys' fees and costs to cause a change in Defendant's corporate policies, practices, and procedures so that Defendant's Websites will become and remain accessible to blind and visually impaired consumers.

## JURISDICTION AND VENUE

8.     This Court has subject-matter jurisdiction over this action under 28 U.S.C § 1331 and 42 U.S.C. § 12181 as Plaintiff's claims arise under Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12181, *et seq.* and 28 U.S.C. § 1332.

9.     This Court has supplemental jurisdiction under 28 U.S.C. § 1367 over Plaintiff's claims under the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq*., and the Unruh Civil Rights Act, Cal. Civ. Code § 51 *et seq.*, ("Unruh Act").

10.     Venue is proper in this District under 28 U.S.C. § 1391(b)(1) and (2) because Defendant conducts and continues to conduct a substantial and significant amount of business in this District via the internet regarding the subject Websites addressed by this action.

11.     Defendant is subject to personal jurisdiction in this District.  Defendant has been and is committing the acts or omissions alleged herein in this District that caused some of the injury and violated the rights of Plaintiff and to other blind and visually impaired customers in this District under the ADA, the DCHRA and the Unruh Act.  A substantial part of the acts and omissions giving rise to Plaintiff's claims occurred in this District.

12.    In particular, Plaintiff has been denied the full use and enjoyment of the facilities, goods, and services offered to the general public through its Websites.  Plaintiff lost all opportunities to complete a consumer business transaction being offered by Defendant due to the discriminatory roadblocks faced as a result of Defendant's failure to provide online goods and services that he could effectively utilize as a visually impaired person.

13.    Further, these access barriers that Plaintiff encountered have caused a denial of Plaintiff's full and equal access multiple times in the past, and now deters Plaintiff on a regular basis from accessing the Defendant's Websites in the future without the aid of a sighted person to help him navigate, which is antithetical to the freedoms promised to the visually impaired by the passage of federal and state disability civil rights legislation.

14.    This Court is empowered to issue a declaratory judgment under 28 U.S.C. §§ 2201 and 2202.

## PARTIES

15.    Plaintiff Laurel Hilbert resides in Washington, D.C. In addition, during the period from approximately March 17 through April 9, Mr. Hilbert stayed in Los Angeles, California will retrieving a new visual support dog.  In each location, he attempted to access Defendant's Websites to complete transactions to purchase Defendant's goods and/or services at "brick and mortar" locations.  Regrettably, he was unsuccessful, so he resorted to ordering Philz Coffee goods through Uber Eats, which has an accessible website and/or mobile application.

16.    Defendant's stores where Mr. Hilbert visited included ones located at: (1) from July 2022 through approximately February 12, 2023, 1827 Adams Mill Rd NW Washington, DC 20009; (2) 1110 Ocean Ave San Francisco, CA 94112; (3) 252 S Brand St Unit A Glendale

Los Angeles, CA 91204; and most recently on or about April 4, 2023, 146 S Lake Ave Unit 106 Pasadena, CA 91101.

17.    Plaintiff is a blind, visually-impaired handicapped person and a member of a protected class of individuals under the Americans with Disabilities Act ("ADA") pursuant to 42 U.S.C. §§ 12102(1) – (2), and the regulations implementing the ADA set forth at 28 C.F.R § 36.101 *et seq.*, the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq*., and the Unruh Act under Cal. Civ. Code §§ 51, 52 and 54.6.

18.    Defendant Philz Coffee, Inc., doing business as Philz Coffee in Washington, D.C. and/or www.philzcoffee.com ("Philz"), is and was at all relevant times a Delaware corporation headquartered in California and does business throughout the United States, including the District of Columbia and California, through its internet-based websites and/or mobile applications ("Websites") and "brick and motor" store locations.

19.    Defendant owns and administers its Websites to sell its goods and services online and has offered them to the general public through its Websites to be picked up at its store locations, which are a public accommodation within the definition of the ADA, 42 U.S.C. § 12181(7), the D.C. Human Rights Act ("DCHRA"), D.C. Code § 2-1401 *et seq*., and the Unruh Act, Cal. Civ. Code §§ 51, *et seq*.

## NATURE OF ACTION

20.    The Internet has become a significant source of information, a portal, and a tool for conducting business, doing everyday activities such as shopping, learning, banking, researching, as well as many other activities for sighted, blind and visually impaired persons alike.

21.   In today's tech-savvy world, blind and visually impaired people have the ability to access websites and online platforms using keyboards in conjunction with screen access software that vocalizes the visual information found on a computer screen or displays the content on a refreshable Braille display.   This technology is known as screen-reading software. Screen-reading software is currently the only method a blind or visually impaired person may independently access the internet.   Unless websites and/or mobile applications are designed to be read by screen-reading software, blind and visually impaired persons are unable to fully access websites and the information, products, and goods contained thereon.

22.   Blind and visually impaired users of Windows operating system-enabled computers and devices have several screen-reading software programs available to them.   Some of these programs are available for purchase and other programs are available without the user having to purchase the program separately.   Nonvisual Desktop Access, otherwise known as "NVDA", and "JAWS" are popular, screen-reading software programs available for a Windows computer.   "VoiceOver" is a popular program for Apple devices.

23.   For screen-reading software to function, the information on a website must be capable of being rendered into text.   If the website content is not capable of being rendered into text, the blind or visually impaired user is unable to access the same content available to sighted users.   For VoiceOver users such as Mr. Hilbert, he relies on a Website's features and proper coding, including but not limited to "ARIA" ("accessible rich internet applications") in the Web Content Accessibility Guidelines ("WCAG").   ARIA provides what is presented visually for a visually impaired person.

24.   The international website standards organization, the World Wide Web Consortium, known throughout the world as "W3C," has published version 2.1 of the Web Content

Accessibility Guidelines ("WCAG 2.1").  WCAG 2.1 are well-established guidelines for making websites accessible to blind and visually impaired people.  These guidelines are universally followed by most large business entities and government agencies to ensure their websites are accessible.

## STATEMENT OF FACTS

25.     Defendant Philz Coffee, Inc. is a Delaware corporation that owns and operates online website and/or mobile application programs offering features which should allow all consumers to access the goods and services provided via the internet throughout the United States, including the District of Columbia and California.

26.     Defendant's Websites offer its products and services to the public.  The Websites offer features which ought to allow and avail consumers of the ability to peruse numerous functions to complete a sought-after business transaction, including, as in Mr. Hilbert's case, the ability to buy product offerings.

27.     Plaintiff Laurel Hilbert is a visually impaired and legally blind person, who cannot use a computer without the assistance of screen-reading software.  Plaintiff is, however, a proficient VoiceOver screen-reader user and uses primarily VoiceOver to access the internet, online programs within websites and/or mobile applications.

28.     Mr. Hilbert owns and uses an iPhone which harnesses Apple's "Screen-Reading Software" which enables blind and/or visually impaired persons such as Mr. Hilbert to access and enjoy mobile applications on their phones by reading aloud functions on an application based on the gestures he makes on his iPhone screen (i.e., swiping left and right on his iPhone screen takes him to the upper or lower parts of his screen).

29.   Plaintiff has visited and attempted to access Defendant's Websites using a screen-reader on numerous occasions.

30.   Between July 2022 to approximately April 2023, Plaintiff has visited and attempted to access Defendant's online Websites using screen-reading software in order to purchase Defendant's goods.  Regrettably, he was unable to do so due to inaccessibility issues.  This required Mr. Hilbert to seek assistance from a sighted person to complete the transaction.

31.   Mr. Hilbert travels to California often to visit friends and others given that he lived there in the past.  Accordingly, he intends to seek out Philz Coffee and its goods given his favorable opinion of the quality of the products.  However, he still encounters barriers on Defendant's Websites.

32.   Despite his efforts, Plaintiff was denied a user experience similar to that of a sighted individual due to the Website's lack of a variety of features and accommodations, which effectively barred Plaintiff from being able to enjoy the privileges and benefits of Defendant's goods and services.

33.   Screen-reading software includes the functionality "Quick Navigation," which enables screen readers to navigate through a website using its headings, links, buttons, tables, etc. Specifically, when a screen reader types letters, they correspond to what kind of functions a screen reader uses to learn what it is that a website offers.  For example, if Mr. Hilbert enables "Quick Navigation," he can navigate through a website by using its headings.  He will press "H" on his keyboard once "Quick Navigation" is enabled.

34.   When websites do not incorporate the proper coding and ARIA protocol to mark the functions on their website, the "Quick Navigation" functionality is unable to locate

functions on the Websites because they are unable to read where the headings, links, buttons, tables, etc. are located.

35.    Upon information and belief, several Philz Coffee locations in the Washington, D.C. area have closed in early 2023.  Since the pandemic hit, Philz Coffee generally had its customers use its mobile application to purchase its menu items.  Although locations in the Washington, D.C. area have closed, Philz Coffee still maintains and operates its online application to enable customers to make orders through the application to pick up at locations, including in California.

36.    As an initial matter, Defendant's mobile application does not allow visually impaired users to designate a store location.  Specifically, while in Washington, D.C. and in California, Mr. Hilbert attempted to use Philz Coffee's mobile application to order its products.  When he opened the application and swiped left, he heard "Location," but when he swiped right on the screen, he heard nothing.  This lack of feedback was confusing for Mr. Hilbert and would be for others similarly situated because they are unsure as to whether there is a function that has been mislabeled and improperly labeled on the application where they are not given any means to interact with it, or there is a general gap in the application that causes this to happen.

37.    Nevertheless, when Mr. Hilbert tried to swipe right once again, he heard, "this store is currently closed, USA today."  Upon hearing that the store is closed and trying to interact with the application further to find another store location, Mr. Hilbert continued to swipe right and heard "Recommended," "Compose," a gap in audio where no feedback is given when he made his third swipe, "this store is currently closed," and "Recommended."  In continuing to swipe right a few more times, Mr. Hilbert noticed that the same feedback is

being provided, making him believe that he has gone through all of the functions on the application.

38.     This led Mr. Hilbert to conclude that functions on the mobile application are mislabeled and improperly coded. Assuming that the gap in audio may be an improperly coded section of the application, Mr. Hilbert double-tapped this part of the phone and then heard, "Let's find your Philz." As with the "gap" function that had no label, this function is also clearly mislabeled as it failed to tell Mr. Hilbert what action he needed to take and/or what function(s) or content(s) is associated with it. For example, is this function a button Mr. Hilbert can press that will lead to another function on the application or is this a field where Mr. Hilbert can input text to begin designating a store.

39.     Once Mr. Hilbert tried to interact with the "Let's find your Philz" function, he heard cities and states, but these labels too fail to indicate whether or not these cities can be selected as buttons. Regardless, Mr. Hilbert selected "Los Angeles, California" and then swiped through to hear cities within the Los Angeles area and selected the Pasadena, California location, which also is not labeled specifically as a button. The mislabeling and improper coding issue persist with the menu items associated with this location.

40.     In addition, the functions on the Websites fail to provide feedback to the visually impaired. Once Mr. Hilbert selected the Pasadena, California location, no feedback was provided to confirm that this location had been selected. For blind and/or visually impaired persons, feedback is crucial as this is needed to help such persons confirm whether they have interacted with an application's function in the way they anticipated. Failing to provide feedback and notices contributed to making Defendant's mobile application inaccessible.

41.   Further frustrating Mr. Hilbert, when he finally was able to hear the menu items available in the Pasadena location through Philz Coffee's mobile application, he noticed that he only heard a few menu items including two (2) food items and three (3) coffee items.  However, when he tried to move through, the application did not read aloud any other items and essentially became stuck.

42.   Further, when Mr. Hilbert tried to select any of the menu items to add them into his Cart, the application was neither able to provide any feedback that an item was added into his shopping cart nor was he able to progress further to confirm whether any items had been added to his shopping cart (which at this point seemed inaccessible and non-existent to Mr. Hilbert).  Ultimately, despite his detailed, multiple efforts, Mr. Hilbert was independently unable to make a purchase through Philz Coffee's mobile application.

43.   Regrettably, Defendant's Websites did not work for links or buttons either.  When Mr. Hilbert used buttons and links on Defendant's Websites to navigate to see how he could execute a transaction, select items and make a payment, he was unable to find a button and link that clearly states how to perform each function.

44.   Defendant's Website is not coded properly so Quick Navigation is not working.  Screen reading software did not recognize proper HTML markings.

45.   For the visually impaired, this inaccessibility is especially paralyzing due to their inability to access the entirety of the Websites as the screen reader software Plaintiff and those similarly situated depend on prevents them from navigating through the Website's key features, making certain selections on Defendant's Websites impossible on their own.

46.   Feeling frustrated, Mr. Hilbert attempted to search for the contact information of Defendant's customer service to inform them of the issue he was having.  However, Mr.

Hilbert was unable to find the information as Defendant failed to include an email address nor phone number for an accessibility consultant or customer service agent.  Thus, Mr. Hilbert was only able to leave Defendant feedback through its general feedback form on Defendant's Website.  He never received a response directly from the company.

47.  These access barriers effectively denied Plaintiff the ability to use and enjoy Defendant's Websites the same way sighted individuals do.

48.  Upon information and belief, Defendant's policies and practices denied Plaintiff, along with other blind or visually impaired users, access to Defendant's Websites.  Those policies and/or practices therefore specifically denied the goods and services that are offered to the general public.

49.  Due to Defendant's failure and refusal to remove access barriers to its Websites, Plaintiff and visually impaired persons have been and are still being denied equal access to Defendant's Websites, and the numerous goods, services and benefits offered to the public through those Websites.

50.  The access barriers Plaintiff encountered have caused a denial of his full and equal access in the past, and now deter Plaintiff on a regular basis from utilizing the Websites, presently and in the future.

51.  If the Websites were equally accessible to all, Plaintiff could independently navigate the Websites and access and complete the desired business transaction through Defendant's Websites as sighted individuals do.  He also would not have to use the services of a sighted person to perform simple transactions and interactions with Defendant's Websites.  It is humiliating for a visually impaired person to rely upon the largess of sighted strangers to navigate through the world.  The internet world is no different.

52. Through his attempts to use the Websites, Plaintiff has actual knowledge of the access barriers that make these services inaccessible and independently unusable by blind and visually impaired persons.  Plaintiff attempted to use Defendant's Websites from the District of Columbia from July 2022 through February 2023.  Plaintiff's most recent interaction with Defendant's Websites was on or about April 4, 2023 while temporarily living in Los Angeles, California.  Again, he had to resort to ordering Defendant's goods through Uber Eats as a result of the inaccessibility of Defendant's Websites.

53. Because simple compliance with the WCAG 2.1 Guidelines would provide Plaintiff and other visually impaired consumers with equal access to the Websites, Plaintiff alleges that Defendant has engaged in acts of intentional discrimination, including but not limited to the following policies or practices:

   a. Constructing and maintaining Websites that are inaccessible to visually impaired individuals, including Plaintiff;

   b. Failing to construct, update and maintain Websites that are sufficiently intuitive so as to be equally accessible to visually impaired individuals, including Plaintiff; and

   c. Failing to take actions to correct these access barriers in the face of substantial harm and discrimination to blind and visually impaired consumers, such as Plaintiff, as a member of a protected class.

54. Defendant therefore uses standards, criteria or methods of administration that have the effect of discriminating or perpetuating the discrimination of others, as alleged herein.

55. The Americans with Disabilities Act ("ADA") expressly contemplates the injunctive relief that Plaintiff seeks in this action.  In relevant part, the ADA requires:

> In the case of violations of … this title, injunctive relief shall include an order to alter facilities to make such facilities readily accessible to and usable by individuals with disabilities … Where appropriate, injunctive relief shall also include requiring the … modification of a policy …

42 U.S.C. § 12188(a)(2).

56. Upon information and belief, because Defendant's Websites have never been accessible, and Defendant does not have, and never had, an adequate corporate policy that is reasonably calculated to cause its Websites to become and remain accessible, Plaintiff invokes 42 U.S.C. § 12188(a)(2) and seeks a permanent injunction requiring:

a. That Defendant retain a qualified consultant acceptable to Plaintiff ("Mutually Agreed Upon Consultants") who shall assist it in improving the accessibility of its Websites so that the goods and services on them may be equally accessed and enjoyed by individuals with vision-related disabilities;

b. That Defendant work with the Mutually Agreed Upon Consultant to ensure that all employees involved in its Websites' development and content development be given web accessibility training on a periodic basis at least two (2) times per year, including onsite training to create accessible content at the design and development stages;

c. That Defendant work with the Mutually Agreed Upon Consultant to perform an automated accessibility audit on a periodic basis at least two (2) times per year to evaluate whether its Websites may be equally accessed and enjoyed by individuals with vision-related disabilities on an ongoing basis;

d. That Defendant work with the Mutually Agreed Upon Consultant to perform end-user accessibility/usability testing on a periodic basis at least two (2) times per year with said testing to be performed by individuals with various disabilities to evaluate whether

its Websites may be equally accessed and enjoyed by individuals with vision-related disabilities on an ongoing basis;

e.  That Defendant work with the Mutually Agreed Upon Consultant to create an accessibility policy that will be posted on its Websites, along with an e-mail address and tollfree phone number to report disability accessibility-related problems; and

f.  That Defendant and its computer and/or internet experts monitor Defendant's Websites for up to two (2) years after the Mutually Agreed Upon Consultant validates that the Websites are free of accessibility errors/violations to ensure that it has adopted and implemented adequate accessibility policies.

g.  That Defendant provide Plaintiff's counsel and this Court a report every six (6) months of its efforts to comply and its continued compliance with the ADA, including a representation and warranty that its Websites are free of accessibility errors/violations and to ensure that it has adopted and implemented adequate accessibility policies, which remain legally compliant with disability laws, functional and up-to-date.

57.  Web-based technologies have features and content that are modified on a daily, and in some instances, hourly basis and a one-time "fix" to an inaccessible website and/or mobile application will not cause the website and/or mobile applications to remain accessible without a corresponding change in corporate policies related to those web-based technologies.  To evaluate whether an inaccessible website has been rendered accessible, and whether corporate policies related to web-based technologies have been changed in a meaningful and legally-compliant manner that will cause the website and/or mobile applications to remain accessible, Defendant's Websites must be reviewed on a periodic

basis not less than two (2) times per year using both automated accessibility screening tools and end user testing by disabled individuals.

58.    Although Defendant may currently have centralized policies regarding maintaining, updating and operating its Websites, Defendant lacks a plan and policy reasonably calculated to make them fully and equally accessible to, and independently usable by, blind and other visually impaired consumers.

59.    Defendant has, upon information and belief, invested substantial sums in developing and maintaining its Websites and has generated significant revenue from its Websites and associated transactions at its "brick and mortar" locations throughout the United States, including the District of Columbia and Los Angeles, California.  These amounts are far greater than the associated cost of making its Websites equally accessible to visually impaired customers.

60.    Without injunctive relief, Plaintiff and other visually impaired consumers will continue to be unable to independently use the Websites, violating their rights.

**FIRST CAUSE OF ACTION**
**Violation of the Americans with Disabilities Act**
**(42 U.S.C. § 12181 *et seq.*)**

61.    Plaintiff, on behalf of himself and other visually impaired persons, repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

62.    Section 302(a) of Title III of the Americans with Disabilities Act ("ADA"), 42 U.S.C. § 12101, *et seq.*, provides:

> No individual shall be discriminated against on the basis of disability in the full and equal enjoyment of the goods, services, facilities, privileges, advantages, or accommodations of any place of public accommodation by any person who owns, leases (or leases to), or operates a place of public accommodation.

42 U.S.C. § 12182(a).

63.    Defendant's Websites, which are associated with "brick and mortar" store locations, are a

place of public accommodation within the definition of Title III of the ADA, 42 U.S.C. §

12181(7).  *See Martinez v. Gutsy LLC*, 2022 U.S. Dist. LEXIS 214830, 2022 WL 17303830,

at *1, 7 (E.D.N.Y. Nov. 29, 2022) (on a motion to dismiss, holding that plaintiff plausibly

stated a claim of discrimination due to allegedly inaccessible website); *Del-Orden v.

Bonobos, Inc.*, 2017 U.S. Dist. LEXIS 209251, 2017 WL 6547902, at *1 (S.D.N.Y. Dec.

20, 2017) (same); *Romero v. 88 Acres Foods, Inc.*, 580 F.Supp.3d 9, 19 (S.D.N.Y. 2022)

(collecting cases); *see also Tavarez v. Moo Organic Chocolates, LLC*, No. 21-CV-9816

(VEC), 2022 U.S. Dist. LEXIS 154249, at *2 (S.D.N.Y. Aug. 26, 2022) ("concur[ing] with

the vast majority of other judges in this District who have decided the issue that a 'place of

public accommodation' includes public-facing websites that are not tethered to a physical

location" while "not[ing] that at least seven of its colleagues, one of whom has since

ascended to the Second Circuit, have found that Title III of the ADA applies to websites");

*Wilson v. Fabric Cellar, Inc.*, No. 20-CV-244S, 2021 U.S. Dist. LEXIS 130536 (W.D.N.Y.

July 13, 2021) (choosing to "assume without deciding" that the website is a place of public

accommodation based on the weight of the case law in the circuit); *Slade v. Life

Spectacular, Inc.*, No. 22-CV-0037 (ALC), 2022 U.S. Dist. LEXIS 220079, at *9 (S.D.N.Y.

Dec. 5, 2022); *Panarese v. Sell It Soc., LLC*, No. 19-CV-3211 (ARR) (RML), 2020 U.S.

Dist. LEXIS 119002, at *2 (E.D.N.Y. July 2, 2020), *adopted by* 2020 U.S. Dist. LEXIS

139893, (Aug. 5, 2020); *Reed v. 1-800-Flowers.com, Inc.*, 327 F. Supp. 3d 539, 550

(E.D.N.Y. 2018); *Andrews v. Blick Art Materials, LLC*, 268 F. Supp. 3d 381, 398 (E.D.N.Y.

2017).

64.     The Websites are a service offered to the general public and, as such, must be equally accessible to all potential consumers.

65.     In addition, the Websites are tethered to specific store locations depending in the area of the country where the patron accesses the Websites.

66.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities the opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodations of an entity. 42 U.S.C. § 12182(b)(1)(A)(i).

67.     Under Section 302(b)(1) of Title III of the ADA, it is unlawful discrimination to deny individuals with disabilities an opportunity to participate in or benefit from the products, services, facilities, privileges, advantages, or accommodation, which is equal to the opportunities afforded to other individuals. 42 U.S.C. § 12182(b)(1)(A)(ii).

68.     Under Section 302(b)(2) of Title III of the ADA, unlawful discrimination also includes, among other things:

> [A] failure to make reasonable modifications in policies, practices, or procedures, when such modifications are necessary to afford such goods, services, facilities, privileges, advantages, or accommodations to individuals with disabilities, unless the entity can demonstrate that making such modifications would fundamentally alter the nature of such goods, services, facilities, privileges, advantages or accommodations; and a failure to take such steps as may be necessary to ensure that no individual with a disability is excluded, denied services, segregated or otherwise treated differently than other individuals because of the absence of auxiliary aids and services, unless the entity can demonstrate that taking such steps would fundamentally alter the nature of the good, service, facility, privilege, advantage, or accommodation being offered or would result in an undue burden.

42 U.S.C. §§ 12182(b)(2)(A)(ii) – (iii).

69.     The acts alleged herein constitute violations of Title III of the ADA, and the regulations promulgated thereunder.

70.    Plaintiff, who is a member of a protected class of persons under the ADA, has a physical disability that substantially limits the major life activity of sight within the meaning of 42 U.S.C. §§ 12102(1)(A) – (2)(A).

71.    Furthermore, Plaintiff has been denied full and equal access to the Websites offered by Defendant, has not been provided services that are provided to other patrons who are not disabled, and has been provided services that are inferior to the services provided to non-disabled persons.  Defendant has failed to take any prompt and equitable steps to remedy its discriminatory conduct.  These violations are ongoing.

72.    Under 42 U.S.C. § 12188 and the remedies, procedures, and rights set forth and incorporated therein, Plaintiff requests relief as set forth below.

**SECOND CAUSE OF ACTION**
**Violation of the DCHRA**
**(D.C. Code §§ 2-1401, *et seq.*)**

73.    Plaintiff repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

74.    The DCHRA makes it "… an unlawful discriminatory practice to do any of the following acts, wholly or partially for a discriminatory reason based on the actual or perceived: … disability… of any individual: (1)  To deny, directly or indirectly, any person the full and equal enjoyment of the goods, services, facilities, privileges, advantages, and accommodations of any place of public accommodations." D.C. Code § 1-1402.31(a)(1). Defendant is systematically violating the DCHRA.

75.    In addition, "Any practice which has the effect or consequence of violating any of the provisions of this chapter shall be deemed to be an unlawful discriminatory practice." D.C. Code § 1-1402.68.

19

76. Defendant is a "place of public accommodation" within the meaning of the DCHRA because it is "an establishment dealing with goods and services of any kind," which includes its physical facility located in the District of Columbia and its goods and services offered to consumers in the District of Columbia and California through its Websites.

77. Defendant's Websites are a service provided by Defendant that is inaccessible to patrons like Mr. Hilbert who are visually impaired.  This inaccessibility has denied those visually impaired full and equal access to the facilities and services Defendant makes available to the non-disabled public.  Defendant has violated the DCHRA by denying visually impaired customers the services and products provided by the Websites.  These violations are ongoing.

78. Defendant's actions constitute intentional discrimination against Plaintiff on the basis of a disability in violation of the DCHRA because Defendant constructed and/or maintains its Websites, which are inaccessible to Plaintiff, knowingly maintains its Websites in this inaccessible form, and has failed to take adequate actions to correct these discriminatory barriers even after being notified of the effects of that discrimination.

79. Defendant's actions also constitute a discriminatory practice against Plaintiff on the basis of disability in violation of the DCHRA because the Websites "… [have] the effect or consequence of violating any of the provisions of this chapter…." D.C. Code § 1-1402.68.

80. Defendant is also violating the DCHRA because the conduct alleged herein likewise constitutes a violation of the various provisions under the ADA, 42 U.S.C. § 12101 *et seq.* Courts look to case law interpreting the Americans with Disabilities Act ("ADA") in construing comparable provisions of the DCHRA where no controlling precedent from the

D.C. Court of Appeals exists. *Grant v. May Dep't Stores Co.*, 786 A.2d 580, 583-84 (D.C. 2001).

81.  Defendant's actions were and are in violation of the DCHRA and, therefore, Plaintiff and others similarly situated are entitled to injunctive relief remedying the discrimination.

82.  Plaintiff is also entitled to a preliminary and permanent injunction enjoining Defendant from violating the DCHRA and requiring Defendant to take the steps necessary to make its Websites readily accessible to and usable by visually impaired individuals.

83.  Defendant's denial of accessible Websites and its discrimination against Plaintiff renders it liable for each and every offense for the actual and special damages in an amount to be determined by a jury, and reasonable attorney's fees and costs that may be determined by the Court.  D.C. Code § 2-1403.16.

**THIRD CAUSE OF ACTION**
**<u>Violation of the Unruh Civil Rights Act</u>**
**(Cal. Civ. Code §§ 51, *et seq.*)**

84.  Plaintiff repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

85.  The Unruh Act guarantees equal access for people with disabilities to accommodations, advantages, facilities, privileges, and services of all business establishments of any kind whatsoever.  Defendants are systematically violating the Unruh Act, Cal. Civ. Code §§ 51, *et seq*.

86.  Defendants' Websites, which are associated with "brick and mortar" store locations throughout California and the rest of the United States are "business establishment[s]" within the meaning of the Unruh Act.  Upon information and belief, Defendant generates

millions of dollars in revenue from the sale of its goods and/or services in California and the rest of the United States through its Websites and associated store locations.

87. Defendant's Websites are a service provided by Defendant that is inaccessible to patrons like Mr. Hilbert who are visually impaired. This inaccessibility has denied those visually impaired full and equal access to the facilities and services Defendant makes available to the non-disabled public. Defendant has violated the Unruh Act by denying visually impaired customers, like Mr. Hilbert, the Websites' services and products. These violations are ongoing.

88. Defendant's actions constitute intentional discrimination against Plaintiff on the basis of a disability in violation of the Unruh Act because Defendant constructed and/or maintained its Websites, which are inaccessible to Plaintiff, knowingly maintains its Websites in this inaccessible form, and has failed to take adequate actions to correct these discriminatory barriers even after being notified of the effects of that discrimination.

89. Defendant is also violating the Unruh Act because the conduct alleged herein likewise constitutes a violation of the various provisions under the ADA, 42 U.S.C. § 12101 *et seq.* Section 51, subsection f of the Unruh Act provides that a violation of the right of any individual under the ADA shall also constitute a violation of the Unruh Act. Cal. Civ. Code § 51(f).

90. Defendant's actions were and are in violation of the Unruh Act and, therefore, Plaintiff is entitled to injunctive relief remedying the discrimination.

91. Plaintiff is also entitled to a preliminary and permanent injunction enjoining Defendant from violating the Unruh Act and requiring Defendant to take the steps necessary to make its Websites readily accessible to and usable by visually impaired individuals.

92.   Defendant's denial of accessible Websites and its discrimination against Plaintiff renders it liable for each and every offense for the actual damages, and any amount that may be determined by a jury up to a maximum of three times the amount of actual damages but in no case less than four thousand dollars ($4,000), and any reasonable attorney's fees and costs that may be determined by the Court.  Cal. Civ. Code § 52(a).

93.   On at least one occasion on or about April 4, 2023, Plaintiff attempted unsuccessfully to gain access to Defendant's Websites on his own.  As a result of the inaccessibility of the Websites and its features, Plaintiff had to resort to contacting a sighted person to seek assistance to complete his transaction.  Accordingly, Defendant's actions entitle Plaintiff to a minimum damage of at least $4,000.00.

94.   Plaintiff also seeks reasonable attorneys' fees and costs to pursue this lawsuit and relief.

## FOURTH CAUSE OF ACTION
### Declaratory Relief

95.   Plaintiff repeats and realleges every allegation of the preceding paragraphs as if fully set forth herein.

96.   An actual controversy has arisen and now exists between the parties in that Plaintiff contends and is informed and believes that Defendant denies that its Websites contain access barriers denying blind and/or visually impaired customers the full and equal access to the products, services and facilities contained in its Websites, which Defendant owns, operates and controls, fails to comply with applicable laws, including but not limited to Title III of the Americans with Disabilities Act, the DCHRA and the Unruh Act, prohibiting discrimination against the blind and visually impaired.

97.   A judicial declaration is necessary and appropriate at this time in order that each of the parties may know their respective rights and duties and act accordingly.

## PRAYER FOR RELIEF

WHEREFORE, Plaintiff respectfully requests this Court grant the following relief:

A.  For a judgment that Defendant violated Plaintiff's rights under the ADA, the DCHRA and the Unruh Act;

B.  A preliminary and permanent injunction prohibiting Defendant from violating the Americans with Disabilities Act ("ADA"), 42 U.S.C. §§ 12182, *et seq.*, the DCHRA and the Unruh Act;

C.  A preliminary and permanent injunction requiring Defendant to take all steps necessary to make its Websites fully compliant with the requirements set forth in the ADA and its implementing regulations, so that the Websites are regularly accessible to and usable by blind and visually impaired individuals;

D.  A declaration that Defendant owns, maintains, and/or operates its Websites in a manner that discriminates against the blind and visually impaired persons, and which fails to provide access for persons with disabilities as required by the ADA, the DCHRA and the Unruh Act;

E.  Economic, compensatory and/or punitive damages under the DCHRA and/or Unruh Act, as applicable, in an amount to be determined at trial;

F.  Pre- and post-judgment interest;

G.  An award of costs and expenses of this action together with reasonable attorneys' and expert fees; and

H.  Such other and further relief as this Court deems just and proper.

## JURY TRIAL DEMAND

Pursuant to Fed. R. Civ. P. 38(b), Plaintiff demands a trial by jury on all questions of fact raised by the Complaint.

Dated: June 1, 2023

Respectfully submitted,

**KALBIAN HAGERTY, LLP**

By   /s/ Eric L. Siegel
Eric L. Siegel (Bar No. 427350)
esiegel@kalbianhagerty.com
888 17th Street, N.W., Suite 1200
Washington, D.C. 20006
(202) 223-5600 (Office)
(202) 223-6625 (Facsimile)

*Attorney for Plaintiff Laurel Hilbert*

DocuSign Envelope ID: 87B90E6E-ED68-42B4-BCBE-6C5918580A96

## VERIFICATION

I, Laurel Hilbert, have read the factual allegations of this Verified Complaint for which I provided direct personal experience and information pertaining to the inaccessibility of Defendant's Websites and verify under the penalty of perjury, pursuant to 28 U.S.C. § 1746, that the foregoing is true and correct.  Executed on this 1st day of June, 2023.

DocuSigned by:

*Laurel Hilbert*

DC1A5E2A854344DB...

_____

Laurel Hilbert, Plaintiff